14 A.3d 619 (2010)
In re the Matter of K.B.S., Petitioner,
v.
F.R.S., Respondent.
No. CS07-03151. Petition Nos. 07-38576, 08-11156.
Family Court of Delaware, Sussex County.
Submitted: September 21, 2010.
Decided: September 21, 2010.
*620 Ashley M. Oland, Esquire, Law Office of Edward C. Gill, P.A., Georgetown, DE, Attorney for K.B.S.
Seth L. Thompson, Esquire, Hudson Jones, Jaywork & Fisher, L.L.C., Georgetown, DE, Attorney for F.R.S.

OPINION[1]
HENRIKSEN, J.
This Opinion will address, I hope, the remaining matters outstanding on requests for attorney's fees between these parties on the causes of action that have come before and been decided by me.

Rule to Show Cause for Non-Payment of Interim Alimony and Child Support. (Case No. 08-11156)
On April 04, 2008, Ms. Oland filed on behalf of Ms. K.B.S. ("Wife") a Petition for Rule to Show Cause. The basis of the petition was that Mr. F.R.S. ("Husband") had for several months failed to pay Wife interim alimony in the amount of $3,500 per month as set forth in an Order of February 15, 2008. Also, on that same date, Ms. Oland filed on behalf of Wife a Rule to Show Cause Petition for Husband's failure to pay child support pursuant to an Order dated February 13, 2008. This all occurred around a time when Husband had abandoned his family, and Husband had provided intentionally inflated income figures as part of his simultaneous efforts to obtain a bank loan to save his failing business.
Through various delays, the matter finally was heard on December 19, 2008. The result of that Order was the Court's commitment of Husband to the Department of Corrections pending a payment to Wife of $15,000. At that hearing, the Court concluded that Husband "abandoned his family and his financial responsibilities to them." Furthermore, the Court noted "Husband's wife has had to suffer through financial hardship because of Husband, and even Wife's father has endured the sting of financial hardship due to Husband's abandonment of his responsibilities." The Court also noted that it would consider a request for payment of Wife's attorney's fees, and asked Wife's attorney to submit an affidavit.
In a subsequent Order of this Court dated February 06, 2009, in which the Court reduced the amount of money Husband needed to pay to Wife to obtain his release from incarceration, the Court's Order noted that Wife's attorney had supplied the Court with an affidavit in support of fees. The Court's Order went on to say that Wife's request for attorney's fees would be deferred until the end of the ancillary proceedings between the parties.
The Court has reviewed Ms. Oland's affidavit which shows between the time of April 02, 2008, and the eventual hearing date of December 08, 2008, Ms. Oland spent 9.35 hours of preparation at a billable rate of $175 per hour, together with $85 in filing fees, for a total amount billed of $1,721.25. The Court finds that this is an appropriate amount of time spent on this very difficult issue, all caused by Husband's fraud upon and abandonment of his family, and that Ms. Oland's hourly rate for these services is more than reasonable *621 given the Court's familiarity with Ms. Oland's experience and ability in these matters.
The Court notes that this amount of $1,721.25, with Husband's agreement, was included in and made part of the final Property Division Order dated January 28, 2010.

Second Rule to Show CauseNon-Payment of Alimony and Failure to Pursue Custody Evaluation (Case Nos. 09-W09/10 -0m8)
The Court has already issued an Order dated June 07, 2010, requiring Husband to pay Wife's counsel $1,882.50 within 30 days of the signing of that Order. Furthermore, the Court ordered Husband to pay Wife the sum of $313.28 for lost wages to attend the hearing and miss a day's work, with that amount being required to be paid to Wife within 30 days of the signing of the Order of June 07, 2010.

Property Division and Remaining Ancillary Matters (Case No. 07-38576)
In the Court's final Property Division Order dated January 28, 2010, the Court permitted each of the parties 15 days from the mailing date of the Order of January 29, 2010, to file requests for attorney's fees, including a memorandum and the necessary affidavit in support thereof. The Order also permitted each party thereafter to have 15 days in which to respond to any application made by the other party for attorney's fees.
Although Husband's counsel correctly notes Ms. Oland did not file a proper affidavit for attorney's fees, the Court will accept the document filed and signed by Ms. Oland in support of her client's request for fees. According to Ms. Oland's filing, Wife is seeking attorney's fees for a period of time from December 05, 2007, until January 29, 2010. Wife is seeking reimbursement for her attorney's fees billed at $175 per hour for 70.30 hours together with $332 in filing fees, for a total reimbursement of $12,634.50. Wife's counsel did not submit any memorandum in support of why the Court should require Husband to pay all or part of Wife's property division and alimony related attorney's fees. Furthermore, the document of Wife's counsel seeking attorney's fees lacks sufficient detail to describe what was done for the various time entries. Where the ancillary matters were only part of several pending matters between the parties, and where there also appears to be several duplications of time requests from another fee application already granted following a December 30, 2008 hearing, the Court must deny Wife's request for reimbursement for any of her fees and costs.
Husband, through counsel's affidavit, along with an accompanying memorandum, has also filed a request for attorney's fees following the ancillary hearing.
The general rule regarding payment of attorney's fees is that "apart from statute or contract, a litigant must pay his counsel's fee."[2] Pursuant to 13 Delaware Code, Section 1515, the Court may also consider the financial resources of both parties when considering to order a party to pay all or part of the cost of the other party maintaining or defending any proceedings under Title 13.
Delaware decisions also recognize certain narrow "equity" exceptions to the general rule that litigants must pay their own counsel fees. In order for the Court to invoke this inherent power, there must be a showing of bad faith or some other *622 equivalent conduct.[3] The Delaware Supreme Court has also ruled that the Court order a party who has been litigious or unreasonable to pay a portion of the other parties' fees.[4]
As noted by former Family Court Judge Wakefield, "it is obvious that taking an unreasonable position or refusing to negotiate in good faith results in prolongation of litigation and therefore constitutes "excessively litigious conduct" within the meaning of the Mays case."[5] In the Hildick Decision, Judge Wakefield went on to state the following:
The entire fabric of civil litigation is dependent upon the willingness of parties to settle cases at the earliest opportunity before trial and not to assert positions which are unreasonable or against decided case law. Parties and their attorneys must act in good faith in this respect and, conversely, a party who tenaciously adheres to an unreasonable position or one which is clearly against decided statutory or case law should not be able to avoid the consequences, one of which may be reimbursing the other party for counsel fees after the adverse judgment is entered by the Court.[6]
At the same time, the Court must also recognize with patient understanding, as stated by former Family Court Judge James, "... that the emotional turmoil present in most domestic litigation sometimes compels litigants to take unreasonable adversarial positions."[7]
Having cited all of the foregoing cases in an earlier Decision of this Judge dated July 10, 2001, this Judge went on to state the following:
This recognition of the reality of the existence of emotional turmoil in domestic cases, does not, however, excuse bad faith conduct, especially where attorneys are involved and expected to guide their clients. Not only does the overt unreasonable position weaken the necessary settlement fabric of civil litigation, so does the more subtle failure to communicate reasonable offers of settlement, and the failure to respond to offers of settlement. Silent inaction is just as unreasonable in settlement negotiations, as is overt unreasonable action, and each vice results in protracted and unnecessary litigation.[8]
The foregoing identical language was used by this Judge in his 2003 Decision in the case of Smith v. Matson.[9] Indeed, the Smith v. Matson case just cited is the attorney's fees portion of the case between the same parties involved in the 2001 A.L.M. v. T.C.M. ancillary decision previously cited.
The property division aspect of the present case was delayed and frustrated by three positions taken by Wife, two of which would most likely have been viewed even by the common man as clearly unfair. The first of those positions involved Wife averring that Husband had relinquished completely his share of any equity in what the parties believed to be valued $750,000 *623 dream home when, during a time when his marriage and business were both falling apart, he signed a quit claim deed over to Wife in order to protect this asset for his family from claims of creditors. Wife averred that Husband's actions in signing this quit claim deed of the real estate to Wife during these desperate times resulted in an agreement of the parties which established Husband had relinquished his marital interest in the property to Wife. The Court notes that Wife was unable to articulate in her testimony that such was her understanding of why the quit claim deed was signed. Making Wife's argument even more preposterous was the suggestion that, while Husband had relinquished his entire equity in the home, Husband should still be responsible for one-half of the debt against the home.
The Court finds somewhat troubling Wife's counsel's response to Husband's application for attorney's fees, in paragraph 4, where Counsel states Wife's belief to be the following:
By way of further response, Wife believes that the Court also found [the issue of whether Husband relinquished his equity to the marital home when signing a quit claim deed] to be an interesting area of law and legal opinion as a substantial portion of the actual Ancillary Order was dedicated to this issue and doesn't believe the Court spent quite a bit of case law and contract law analysis. Wife still believes it is a legitimate position for her to take to Court although she did not prevail in the Court's ultimate decision. (Emphasis added).
Having read that "wife believed" the Court did not spend much time doing case law and contract analysis on the issue of the quit claim deed, the Court went back and reviewed the several pages of its Decision which addressed exactly this area. A review of the Court's Opinion demonstrates the Court spent a considerable amount of time describing the desperate events leading up to Husband signing the quit claim deed, as well as the intent and understanding, or lack of it, of each of the parties about the effect of the quit claim deed. A review of the Court's Opinion also demonstrates that the Court reviewed and took into consideration Professor Corbin, the Restatement of Law, the Oregon Supreme Court, the Vermont Supreme Court, Black's Law Dictionary, and a Decision of former Family Court Judge Wakefield.
When reviewing Wife's counsel's nonaffidavit filed in support of Wife's attorney's fees, the Court found that Wife's counsel had performed 2 hours of research on September 17, 2009, and another 3 hours of research on September 22, 2009. The Court found no time designated by Wife's counsel for research of case or contract law on the quit claim issue prior to the trial dates of September 09 and 10, 2009, despite Husband's attorney's invitation to do so in his letter to Wife's counsel dated July 08, 2009.
The second of these basically unfair positions involved Wife's continuing insistence on receiving future alimony. Wife was unrealistic in her expectations that Husband could continue to earn the $75,000 to $100,000 per year he had enjoyed making a few years back in the concrete industry during the construction boom, but now was unable to earn such income where the employment and pay rates in that industry had tumbled due to the considerable recession in real estate. Wife also seemed to express an entitlement to receive sufficient sums from Husband so that she could remain in a dream home which the parties had never lived in during their marriage. The dream home was at least three times bigger than the home in which the parties had resided for *624 the majority of their almost 12 year marriage. The expenses of maintaining the dream home were also far in excess of the expenses the parties had when living in their former marital home. It was Wife's position that the manner to which the parties had become accustomed during the marriage, a necessary element in considering an award of alimony, was the dream the parties had hoped for, but never realized, rather than the reality the parties had lived during the majority of their marriage. Wife's argument became even more bizarre when the Court learned Wife felt she was entitled to be maintained by Husband in the $650,000 [10] dream home while Husband should be denied even $900 per month rent for him to have a place to reside. In Wife's opinion, Husband, because of what he had done to his family, should live with and off of friends.
The third major problem in Wife's case, which consumed a considerable amount of time and likely precluded any chance of settlement, was Wife's position, bolstered by the belief of her father, that Husband had used over $200,000 in funds for his own business or extravagances rather than applying the money to payment of subcontractors for work performed on the dream home. Wife's father provided a certain amount of testimony on this allegation. Wife's father is a high level executive who, at this point in his career, was a project director for a major engineering corporation specializing in industrial design and construction of major facilities all over the world. Wife's father's demeanor made for a rather imposing witness. Wife, assumedly with her father's assistance, placed into evidence a rather elaborate and complicated flow sheet of funds. Unfortunately, the Court could not discern from the testimony around this flow sheet that Father had wrongly utilized funds intended for the dream home, although Father acknowledged he had spent foolishly and extravagantly out of funds from his new business. If Husband had misused his father-in-law's funds, it would not have surprised the Court given the nature of how Wife's father and Wife handled the payments on checks out of Wife's father's account. As explained in the final Property Decision, Father would sign blank checks on his account and deliver them to his daughter, the wife. Wife would then turn the signed checks over to Husband when he requested checks to make payments to subcontractors who had done work on the dream home. It was during a gap of time of a few months when the parties were separated that Wife claims Husband misused funds. However, during this same gap of time, the just described procedure of Father signing blank checks, and Wife then delivering those checks to Husband, continued. If Husband had misused these funds written on checks out of Wife's father's account, it certainly could have been easily proved by introduction of the checks. For reasons unknown to the Court, Wife, with her father's assistance, noting that he would have been the only one to have access to the checks, never confronted Husband with any of the alleged inappropriately used checks, nor did Wife place any of the checks into evidence. Thus, Wife's claim that Husband misused $200,000 of funds for items or bills not related to the dream home, which are now part of the marital debt, was never proved.
There is no doubt that early in the separation of these parties Husband abandoned his family, leaving them clueless as to his whereabouts and also why creditors were *625 suddenly knocking at the door. Wife was certainly justified in harboring a considerable amount of anger at Husband. Unfortunately, it is the Court's perception that Wife's early justified anger at her husband for his abandonment transitioned into a sense of entitlement which ignored completely the Court's requirement to make an equitable division of marital property and alimony without regard to fault.
A review of correspondence submitted by Husband's attorney as part of his application for attorney's fees, demonstrates that Husband made an effort to resolve this matter by making various written communicated offers of settlement. Wife, on the other hand, failed to make any counter-offers of settlement, except perhaps a verbal offer made after a four-way meeting held around July 08, 2009, and as memorialized in a letter by Husband's counsel dated July 08, 2009. Wife remained as immovable as ever, despite Husband's counsel's statement that his "cursory search of case law" did not show any support for the argument Wife was making. Indeed, Husband's counsel invited Wife's counsel to perform her own research and convince him otherwise. Husband's counsel also indicated that Wife's position was not supported by any case he could find, and also violated the principals of basic fairness. The Court agrees.
The Court notes that the end result of its Property Division Order, after modifications for reargument, basically resulted in Wife receiving the dream home and her various pensions and retirement plans, with Husband paying her approximately $63,000 composed of interim alimony arrearages, reimbursement for concrete company debts, and payment of one Rule to Show Cause attorney's fee. The Court's Decision denied Wife's claim for alimony, except for a limited time so Wife could maintain the dream home while she relocated and sold the home given the likelihood that Wife alone could not afford to maintain it.
Husband's first offer of April 28, 2009, like the final award, gave Wife the home together with the responsibility for the home associated debts, with each party being responsible for any other debts in their own name and each party owning assets in their own name. Also, Husband's offer included Husband not having to pay any alimony. This offer was not necessarily unreasonable at the time when both parties believed that the dream home had a value of $750,000, rather than the eventually agreed upon $650,000 value. This offer thus contemplated Wife would receive a net equity in the dream home of approximately $90,000 rather than a default equity reflected in the actual Court Decision.
Wife's settlement conference proposal around July 08, 2009, would have basically left Wife with the dream home at $750,000, subject to her payment of approximately $350,000 in debt against the home, and Husband's payment of approximately $350,000 in debt. In addition to Wife receiving the net effect of $400,000 equity in the home, with each party paying half of the approximate $700,000 in debt against the dream home, Wife also expected Husband to pay her another $60,000 composed of reimbursement for concrete debts, Rule to Show Cause attorney's fees, and back alimony of approximately $43,000. Wife's proposal was not even close to the final outcome of this case.
About one month before trial, Husband's attorney made another proposal of settlement where Wife would receive the home, which the parties believed to be valued at $750,000, less the home related debt, for equity of approximately $90,000. In addition, Husband would reimburse Wife onehalf of the concrete debt, interim alimony *626 arrears of $11,000, and payment of her Rule to Show Cause attorney's fees of $1,721.25. Wife would also receive her various pensions and retirement related funds free and clear of any interest of Husband. The sum and substance of this offer, although the parties at this time believed Wife would have received an equity in the home of about $90,000 at an overall value of $750,000.00, would have been that Wife would have received everything she received in the division of property, together with Husband paying her $20,000 instead of the approximately $63,000 amount actually ordered by the Court.
Because both parties were under the misconception for quite some time that the real estate was valued at $750,000, all of the offers are difficult to equate with the actual final Order of the Court, where the parties had, just before trial, stipulated to a reduced value of the dream home at $650,000. What is clear, however, is that Husband was making a good faith effort to settle the case, and Wife was being adamant about not settling the case. Wife continued to insist Husband agree to terms of settlement based upon a clearly unfair approach held by Wife which required Husband to accept, in full, the absurdity of Wife's quit claim deed argument and Wife's demand for alimony to maintain her in a lifestyle well above what the parties enjoyed together during the marriage. Had Wife been more open to the reality that these arguments would not succeed, this case might have been settled with a considerable saving in attorney's fees to both parties.
Husband's attorney's affidavit of time for which he is seeking reimbursement begins with the date of the first settlement offer Husband made on April 28, 2009. As already noted, if Wife had accepted Husband's offer at that time, Wife would have ended up with the home, the debt against the home, and her various pension and retirement related plans. She would not have received the almost $63,000 the Court awarded for reimbursement of concrete bills, Rule to Show Cause attorney's fees, and interim alimony. But Husband's offer was clearly closer than the inflexible position maintained by Wife throughout the proceedings. It appears to the Court that Wife never even gave consideration to deviating from her offer wherein she sought $300,000 to $400,000 in equity of the house, expected Husband to pay $350,000 of the debt against the house, expected Husband to pay an additional $60,000, and also expected Husband to pay Wife alimony to maintain Wife in the dream home while expecting Husband to live with friends.
Husband's counsel's letter to Wife's counsel dated July 08, 2009, discussed his cursory search of case law and basic fairness, and invited Wife's counsel to convince him otherwise by providing any case law she might have found. Apparently, at that time, with Wife not stepping back to consider the overall fairness of her position, Wife remained steadfast in her unreasonable position of settlement. Husband made further unsuccessful attempts at settlement, and the matter ended up at trial. Indeed, Husband's offer of August 09, 2009, fell only approximately $43,000 short of the Court's eventual award.
From April 28, 2009, through and including August 06, 2009, Husband's attorney spent 5.3 hours, some of it research. Husband's counsel spent 1.5 hours on February 11, 2009, preparing his application for fees, including case law. The Court generally does not award fees for the fee application. Deducting the aforesaid 5.3 hours and the 1.5 hours from the total time worked by Husband's counsel of 33.2 hours, leaves 26.4 hours that Husband's attorney spent between August 11, 2009, *627 and up to the time just prior to Husband's attorney preparing his application for fees. Had Wife been more flexible and realistic in her position on settlement, the Court will roughly estimate the parties would have spent another 4 hours in time in negotiating settlement and preparing a final agreement for submission to the Court. This leaves 22.4 hours. Multiplying 22.4 hours at Husband's attorney's very reasonable rate of $225 per hour equals $5,040. The Court hereby awards Husband attorney's fees of $5,040 with said amount to be offset from the amount Husband is to pay pursuant to the final decision involving the marital property. Wife's request for fees and costs relating to the property division and alimony is DENIED.
IT IS SO ORDERED
NOTES
[1] Pursuant to Delaware Supreme Court Rule 7(d), pseudonyms have been substituted for the names of the parties. Also, all addresses of property and birthdates have been redacted. DEL. SUP.CT. R. 7(d).
[2] Maurer v. Int'l Re-Insurance Co., 95 A.2d 827, 830 (Del.1953).
[3] Div. of Child Support Enforcement v. Smallwood, 526 A.2d 1353, 1356 (Del. 1987).
[4] Mays v. Mays, 552 A.2d 858 (TABLE), 1988 WL 141148 (Del.1988).
[5] Hildick v. Hildick, 1990 WL 15657, *2 (Del. Fam.Ct. Jan. 2, 1990).
[6] Id.
[7] Gesullo v. Gesullo, 1992 WL 67000, *4 (Del. Fam.Ct. Jan.8, 1992) (citing Bristow v. Linn, 1990 WL 91604 (Del.Fam.Ct. May 30, 1990)).
[8] A.L.M. v. T.C.M., 2001 WL 1773730, *9 (Del. Fam.Ct. July 10, 2001).
[9] 820 A.2d 526 (Del.Fam.Ct.2003).
[10] At time of trial the parties stipulated to a value of $650,000 rather than original earlier amounts of $750,000.